## Union Trust Company of Pittsburgh Case.
## Commonwealth Appeal.

Argued March 23, 1948. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

Ralph B. Umsted, Deputy Attorney General, with him Ruth Forsht, Special Deputy Attorney General and T. McKeen Chidsey, Attorney General, for appellant.

P. K. Motheral, with him Reed, Smith, Shaw & McClay, for Mellon National Bank & Trust Company, successor to Union Trust Company of Pittsburgh, appellee.

Charles C. Arensberg, with him Thomas L. Wentling and Patterson, Crawford, Arensberg & Dunn, for Peoples First National Bank & Trust Company, formerly Peoples-Pittsburgh Trust Company, appellee.

OPINION BY MR. JUSTICE HORACE STERN, May 26, 1948:

The question here involved is the constitutionality, as applied to national banks, of the Act of May 16, 1919, P. L. 177, amended by the Act of April 21, 1921, P. L. 211, and partly embodied in section 1310 of the Act of April 9, 1929, P. L. 343.

Acting in pursuance of those statutes the Attorney General filed petitions against the Union Trust Company of Pittsburgh, now, by merger, Mellon National Bank & Trust Company, and against Peoples-Pittsburgh Trust Company, now, by merger, Peoples First National Bank & Trust Company, praying for orders for the payment into the State Treasury, without escheat, of certain unclaimed moneys held by those banks as depositories. Answers were filed in the nature of demurrers which were sustained by the court below. The petitions were dismissed and the Commonwealth appeals.

For a proper understanding of the issues it is essential that there be kept in mind the vital distinction between the Act of June 7, 1915, P. L. 878,[1] and the Act of May 16, 1919, P. L. 177.[2] The Act of 1915 is an Escheat Act. As amended, it provides that bank deposits which have not been increased or decreased, nor credited with interest at the request of the depositor for a period of ten successive years, shall be escheated to the Commonwealth. Reports of such deposits are required to be made by the banks, and a procedure by which the Commonwealth may recover the money is established. Proceedings under this Act, if successfully pursued, result in a decree that the money has escheated and shall be paid to the State Treasurer for the use of the Commonwealth, thereby foreclosing any claim on the part of the depositor.[3] The Act of May 16, 1919, P. L. 177, as amended, is quite different; it establishes an alternative procedure for the taking over of unclaimed deposits by the State. It provides "That whenever any . . . bank, national bank, . . . shall hold or be possessed of any items of money or property which are or shall be made escheatable by any act of the General Assembly, the Auditor General may and shall, after such items have been reported to or otherwise ascertained by him, and after notice and advertisement of such items shall have been given and made as required by the provisions of the act under which such items are escheatable, . . . suggest to the Attorney General that, instead of proceeding for the escheat of such items . . . the Attorney General apply by petition to the proper court for an order upon the . . . bank, national

---

[1] This act has been amended by the Act of July 6, 1917, P. L. 725, the Act of July 12, 1919, P. L. 926, the Act of April 21, 1921, P. L. 223, and the Act of May 16, 1935, P. L. 195.

[2] This act has been amended by the Act of April 21, 1921, P. L. 211.

[3] The depositor may, however, at any time within ten years after the payment into the State Treasury, recover the money upon making satisfactory proof of his ownership and establishing that he had neither appeared nor had actual notice in the proceedings to escheat.

bank, . . . holding or possessed of such items of money or property, directing the payment of the same into the State Treasury to the credit of the Commonwealth, . . . all amounts and proceeds so paid to be subject to being refunded as hereinafter provided. . . ." The Act then provides that the Attorney General shall thereupon file such a petition, and the court, if the facts warrant, shall order the unclaimed money to be paid into the State Treasury to the credit of the Commonwealth, and, upon such payment being made in compliance with the court's order, the bank shall be relieved from all liability for the money so paid. By section 504 of the Act of April 9, 1929, P. L. 343, as amended by the Act of June 6, 1939, P. L. 261, section 2, it is provided that the owner of any money thus paid into the State Treasury, or his legal representatives, may at any time apply to the Board of Finance and Revenue for a refund thereof, and, upon satisfactory proof of ownership, the money shall be paid to him with interest at the rate of two per centum per annum from the time of the payment into the State Treasury to the time of such refund.

It is thus immediately obvious that the two Acts, that of 1915 and that of 1919, have little in common. The former provides for complete divestiture of the depositor's title; the latter effects merely a custodial taking over of the money to be held thereafter in the State Treasury for delivery to the owner whenever he shall appear.

It is with the Act of 1919 that we are concerned in the present proceedings. Its validity is challenged on the ground that it impairs the obligation of the contract between the bank and the depositor. This contention is wholly without merit; a similar charge was made against the far more drastic Act of 1915 and rejected in *Germantown Trust Company v. Powell*, 265 Pa. 71, 108 A. 441. The Court there pointed out (pp. 77, 78, A. p. 443) that "The agreement of the bank or depositary . . .

is merely to keep the money of the depositor until it is demanded by the owner, or his duly authorized representatives. It agrees to pay on demand. When demand is made the contractual relation ceases, there being no vested right to continue the contract in force thereafter, or for any definite time. . . . A statute of escheat, in effect, simply provides for a termination of the contract of deposit, at the instance of the Commonwealth and by virtue of its sovereign power, where there are no heirs to claim the property, after the death of the owner, or after expiration of such reasonable time as may be fixed by law to raise a presumption of death. . . . The right of escheat has been recognized under the English law from the earliest times and has also been the subject of continuous statutory regulation in Pennsylvania from colonial days, . . .; the validity of these acts has been sustained without suggestion that their enforcement violates any contract between the owner of the property and the person or institution in whose hands the property was deposited or placed for keeping." Certainly if the actual escheat of the deposit does not impair the obligation of a contract the much milder operation of merely taking custodial possession of the money subject to its being returnable to the owner on demand cannot be considered a violation of the constitutional provision: *Provident Institution for Savings v. Malone, Attorney General,* 221 U. S. 660; see also *Philadelphia Electric Co. Case,* 352 Pa. 457, 463, 43 A. 2d 116, 119. Nor has the bank itself any tontine right to retain such unclaimed money whereby its other depositors or its stockholders would eventually be entitled to receive it: *Provident Institution for Savings v. Malone, Attorney General,* supra; *Security Savings Bank v. State of California,* 263 U. S. 282, 285, 286.

Another assault on the constitutionality of the Act is based upon the provision, which, as amended, prescribes that, prior to the filing of a petition for the taking over of unclaimed deposits without escheat, there

shall be given the notice and there shall be made the advertisement required by the Act under which such moneys are escheatable.[4] It is necessary, therefore, in order to ascertain what notice is thus required, to refer to the Act of 1915, which is the Act under which such moneys are escheatable. Section 6 of that Act, as amended, provides that when a report of unclaimed moneys is received from the depository the depositor shall be notified of such fact by a letter mailed to him at the address furnished by the bank, if any, and a statement of all such unclaimed deposits shall be published once a week for two successive weeks during the month of July in each year in one or more general newspapers in the city or county where the bank is located;[5] it is provided, however, that such publication shall not be considered a condition precedent to the institution or prosecution of any action for the escheat of the unclaimed moneys.[6]

The court below concluded that, under this latter provision, publication of a statement of the unclaimed deposits is not mandatory but wholly optional with the Commonwealth, and that thereby the due process clause of the 14th Amendment of the Federal Constitution, and Article I, Section 9 of the Constitution of Pennsylvania are violated. It may be questioned whether such option is in fact given in the case of proceedings under the Act of 1919 *without escheat,* since the particular clause which provides that publication is not to be considered a condition precedent to the institution or

---

[4] Section 1310 of the Act of 1929 provides merely for notice and advertisement "as required by law".

[5] The publication is not required of any item the amount of which is less than $10 unless deemed to be in the best interests of the Commonwealth. Publication may also be made in a legal periodical designated for the publication of legal notices, if deemed for the best interests of the Commonwealth, in addition to publication in a general newspaper.

[6] Substantially these same provisions are repeated in section 1307 of the Act of 1929.

prosecution of any action is expressly made applicable only to actions for the *escheat* of the unclaimed moneys. However, the required notification of the depositor by mail to the address furnished by the bank is in itself sufficient to fulfill the requirements of due process; indeed it is extremely doubtful whether any notice whatever is required.[7] Whether the notice given to parties in interest in any particular situation complies with the requirements of procedural due process must always be determined in relation to the type of proceedings involved, the purpose of the statute under which they are instituted, and the extent to which they affect the interest in the property involved: *Ballard v. Hunter*, 204 U. S. 241, 255; *North Laramie Land Co. v. Hoffman*, 268 U. S. 276, 282-283; *Dohany v. Rogers*, 281 U. S. 362, 369; *Anderson National Bank v. Luckett, Commissioner of Revenue*, 321 U. S. 233, 246. The depositor, of course, is bound to know the provisions of the Act of 1919 and therefore to be aware of the fact that, if his deposit is in the dormant condition which makes the Act applicable, possession of the money may at any time be taken by the Commonwealth, subject always to his demand for a refund thereof. In dealing with a substantially similar statute this Court said, in *Commonwealth v. Dollar Savings Bank*, 259 Pa. 138, 146, 147, 102 A. 569, 572, that ". . . since the proceedings on the part of the State to obtain possession of these deposits were not instituted for the purpose of declaring an escheat or of passing the property in question over to another, in short, were not in antagonism to the owners, but for their benefit, there exists no absolute necessity for any form of notice to such owners, as the latter are presumed to know that, after expiration of the thirty-year period, the Commonwealth, at any time, may take over the custody of their deposits in the manner provided by the act dealing with the subject in

---

[7] In the present case notice was in fact given both by mail and by publication.

hand." Since the transfer here of the moneys is simply a change of custody and not a confiscation or an ultimate adjudication involving title, and since the deposits may be reclaimed at any time, the rights of the owners are in nowise affected; in such a situation the statute itself, followed by the taking over of the funds upon filing of the petition, is sufficient notice: *Brooklyn Borough Gas Co. v. Bennett,* 277 N. Y. S. 203, 219; *State v. Security Savings Bank,* 154 P. 1070, 1072, 1073 (Cal.); *Anderson National Bank v. Reeves,* 293 Ky. 735, 740, 741, 742, 170 S. W. 2d 350, 353, 354; see Earl S. Wilson, The Disposition of Dormant Bank Deposits and Other Unclaimed Property, 32 Ky. L. J. 41. "The statute itself is notice to all depositors of banks within the state, of the conditions on which the balances of inactive accounts will be deemed presumptively abandoned, and their surrender to the state compelled. All persons having property located within a state and subject to its dominion must take note of its statutes affecting the control or disposition of such property and of the procedure which they set up for those purposes. . . . The statutory procedure, so far as it affects depositors, is in the nature of a proceeding in rem, in the course of which property, against which a claim is asserted, is seized or sequestered, and held subject to the appearance and presentation of claims by all those who assert an adverse interest in it. In all such proceedings the seizure of the property is in itself a form of notice of the claim asserted, to those who may claim an interest in the property. . . . The mere fact that the state or its authorities acquire possession or control of property as a preliminary step to the judicial determination of asserted rights in the property is not a denial of due process.": *Anderson National Bank v. Luckett, Commissioner of Revenue,* 321 U. S. 233, 243, 245, 247. It is abundantly clear, therefore, that there is no want of due process either in the provision for notification to de-

positors or in any other features of the procedure prescribed by the Act of 1919 as amended.

This brings us to the final question in the case and that is whether the Act of 1919, which, by its terms, is expressly made applicable to national banks, can validly be so applied, or whether such application would create an unconstitutional interference with the national banking system. In considering this question we start with the proposition that, generally speaking, there is no constitutional objection to extending the provisions of a state statute to cover national banks. Although national banks are instrumentalities of the federal government and used by it to conduct some of its important operations, "All their contracts are governed and construed by State laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on State law. It is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional": *National Bank v. Commonwealth*, 76 U. S. 353, 362. National banks "are subject to State legislation, except where such legislation is in conflict with some act of Congress, or where it tends to impair or destroy the utility of such banks, as agents or instrumentalities of the United States, or interferes with the purposes of their creation": *Waite v. Dowley*, 94 U. S. 527, 533. It is only where the attempt by a State statute to define the duties or control the conduct of the affairs of national banks "expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation or impairs the efficiency of these agencies of the Federal government to discharge the duties for the performance of which they were created", that such an act is invalid. "It is certain, that in so far as not repugnant to acts of Congress, the contracts and dealings of national banks are left subject to the state law": *Davis v. Elmira Savings Bank*, 161 U. S. 275, 283, 287; *McClellan v.*

*Chipman,* 164 U. S. 347, 357. "National banks are subject to the laws of a State in respect of their affairs unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as federal agencies or conflict with the paramount law of the United States": *First National Bank in St. Louis v. State of Missouri,* 263 U. S. 640, 656; see also *Anderson National Bank v. Luckett, Commissioner of Revenut,* 321 U. S. 233, 248.

It is true that in the case of *First National Bank of San Jose v. State of California,* 262 U. S. 366, (followed in *National City Bank v. Philippine Islands,* 302 U. S. 651) a state law which provided for the escheat of bank deposits which had remained intact and unclaimed for more than twenty years was held invalid when applied to deposits in national banks. But that decision was expressly based solely upon the ground (p. 370) that the statute "attempts to qualify in an unusual way agreements between national banks and their customers long understood to arise when the former receive deposits under their plainly granted powers. . . . The success of almost all commercial banks depends upon their ability to obtain loans from depositors, and these might well hesitate to subject their funds to possible confiscation." [8] Such a reason for invalidation has obviously no application to a statute which, as the one here under consideration, involves no confiscation or transfer of title from the depositor to the Commonwealth, no escheat by reason of mere dormancy of the bank account, and therefore no danger of causing depositors to refrain from making deposits in national banks, especially in view of the fact that they may at any time secure a return of their deposits from the State which meanwhile bear interest and are in the hands of the safest-possible custodian.

---

[8] The same California statute was held constitutional as applied to state banks in *Security Savings Bank v. State of California,* 263 U. S. 282.

This distinguishing feature became the basis of the decision, contrary to that in the *San Jose* case, in *Anderson National Bank v. Luckett, Commissioner of Revenue,* 321 U. S. 233 which is the last pronouncement of that tribunal upon the question here involved.[9]

In the *Anderson National Bank* case there came under review a statute of the State of Kentucky which provided that demand deposits were to be presumed abandoned if the owner thereof had not for the preceding ten successive years negotiated in writing with the bank, had not been credited with interest on the deposit at his request, had not had any transaction with regard to the deposit noted upon the books of the bank, and had not increased or decreased the amount of deposit; such presumably abandoned property was to be reported and turned over by the depository to the State Department of Revenue; the depositor could thereafter claim the money at any time prior to a judicial determination of actual abandonment. The Supreme Court of the United States held that this statute did not conflict with the national banking laws and that it was not an unconstitutional interference by the State with national banks as instrumentalities of the federal government. The court said (p. 241) that "it is within the constitutional power of the state to protect the interests of depositors from the risks which attend long neglected accounts, by taking them into custody when they have been inactive so long as to be presumptively abandoned." The Court pointed out (pp. 250, 251, 252) that the decision in the *San Jose* case "turned rather on the effect of the state statute in altering the contracts of deposit in a manner considered so unusual and so harsh in its application to depositors as to deter them from placing or keeping their funds in national banks. . . . It will be noted that the statute required no proof

---

[9] Cf. *Territory of Alaska v. First National Bank of Fairbanks,* 22 F. 2d 377.

that the forfeited accounts had been in fact abandoned, . . . Upon mere proof of dormancy for the prescribed period, the statute declared the accounts to be escheated to the state. . . . Here there is no escheat or forfeiture by reason of dormancy. Dormancy without more is made the statutory ground for the state's taking inactive bank accounts into its custody, the state assuming the bank's obligation to the depositors. . . . This is not confiscation or even an attempted deprivation of property. Escheat or forfeiture to the state may follow, but only on proof of abandonment in fact. We cannot say that the protective custody of long inactive bank accounts, for which the Kentucky statute provides, and which in many circumstances may operate for the benefit and security of depositors, . . . will deter them from placing their funds in national banks in that state."

The Act of 1919, like the Kentucky statute thus declared constitutional, involves merely a change of custody and not an adjudication of title, in which latter event actual abandonment and not mere inactivity of the account might have to be established; the money which is paid into the State Treasury is held subject to refund, with interest, at any time upon satisfactory proof of ownership, and the bank is protected because it is discharged from liability for payment of the money pursuant to an order of the court. "In such instance, the Commonwealth is not required to aver or prove facts which, of course, would be essential to the escheator's case if a decree of escheat were sought. . . . All that the Commonwealth here seeks is to have the moneys or property paid into the State Treasury to its credit, there to be held for the benefit of the owners or claimants entitled thereto. The rights of the latter are in no wise affected adversely. In fact, they are improved by being made more enduring and secure with the Commonwealth as the substituted depository or

376

custodian.": *Pennsylvania Power & Light Co. Case,* 352 Pa. 466, 469, 43 A. 2d 114, 116.[10]

It is thus abundantly clear that, under both our own decisions and those of the Supreme Court of the United States, the Act of 1919 does not, in its application to national banks, involve any such interference with their operations or impairment of their efficiency as instrumentalities of the federal government as to render the Act unconstitutional when so applied.

The orders of the court below are reversed, and the record is remanded with direction to enter orders in accordance with the prayers of the petitions; costs to be paid by appellees.

---

[10] Although the Act of 1919 cannot be invoked unless the deposits "are escheatable" under the Act of 1915, the phrase "are escheatable" has reference only to the status of the funds as unclaimed moneys for the prescribed period of time and not to the question whether an actual decree of escheat would be justified: *Pennsylvania Power & Light Co. Case,* supra. Therefore the unclaimed moneys in national banks may be taken into custody by the State under the Act of 1919 for safekeeping even though they may not be ultimately escheatable under the decision in the *San Jose* case.